UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| DANIELLE J. SARGENT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:20-cv-30088-KAR |
| | ) | |
| KILOLO KIJAKAZI,[1] | ) | |
| Acting Commissioner of Social | ) | |
| Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM AND ORDER REGARDING PLAINTIFF'S MOTION FOR AN ORDER
REVERSING THE DECISION OF THE COMMISSIONER OF SOCIAL SECURITY AND
DEFENDANT'S MOTION TO AFFIRM THE COMMISSIONER'S DECISION
(Docket Nos. 20, 26)

ROBERTSON, U.S.M.J.

I.    INTRODUCTION AND PROCEDURAL HISTORY

 Danielle J. Sargent ("Plaintiff") brings this action pursuant to 42 U.S.C. §§ 405(g) and

1383(c)(3) seeking review of a final decision of the Commissioner of Social Security

("Commissioner") denying her applications for Social Security Disability Insurance Benefits

("DIB") and Supplemental Security Income ("SSI").  Plaintiff applied for DIB on February 28,

2017, and for SSI on March 6, 2017, alleging an onset date of November 28, 2016

(Administrative Record ("A.R.") 252, 259).[2]  Plaintiff claimed disability due to severe anxiety

disorder, arthritis, compressed lower back discs due to age and wear and tear, depression, morbid

---

[1] Pursuant to Fed. R. Civ. P. 25(d), the court directs that Kilolo Kijakazi, Acting Commissioner
of the Social Security Administration ("Commissioner"), be substituted for Andrew Saul.
[2] All citations to "A.R." refer to the administrative record, which appears on the docket of this
case as document 16.  The page numbers were assigned by the SSA and appear in the lower
right-hand corner of each page.

obesity, and asthma (A.R. 305).  Her applications were denied initially (A.R. 132, 147) and on

reconsideration (A.R. 163, 178).  She requested a hearing before an Administrative Law Judge

("ALJ") (A.R. 198-203).  A hearing was held on April 30, 2019 (A.R. 56).  On June 5, 2019, the

ALJ issued an unfavorable decision (A.R. 13-30).  Plaintiff sought review by the Appeals

Council (A.R. 188).  In connection with this review, Plaintiff's attorney submitted additional

evidence to the Appeals Council, dated August 22 to October 17, 2017 (A.R. 115-19); May 10 to

July18, 2019 (A.R. 51-54); and May 22 to July 12, 2019 (A.R. 35-50).  On May 6, 2020, the

Appeals Council denied Plaintiff's request for review (A.R. 1-7).  The Appeals Council's

decision became the final decision of the Commissioner and this suit followed.

Plaintiff appeals from the final decision on the grounds that: (1) taking into account

evidence Plaintiff submitted to the Appeals Council after the ALJ issued the hearing decision,

the RFC crafted by the ALJ was not supported by substantial evidence; (2) the ALJ erred by

giving greater weight to the opinions of the non-examining state agency psychological

consultants than to the opinions of Plaintiff's treating psychologist; (3) the ALJ misconstrued,

and erred by relying on, evidence of Plaintiff's part-time employment after the alleged onset

date; and (4) the ALJ erred at Step 5 by not adopting certain testimony of the vocational expert.

Finally, Plaintiff contends that Plaintiff is entitled to benefits as of September 20, 2020, her

fiftieth birthday, under medical-vocational guidelines concerning individuals approaching

advanced age.  Pending before this court are Plaintiff Danielle J. Sargent's Motion for an Order

Reversing the Decision of the Commissioner of Social Security ("Plaintiff's Motion") (Dkt. No.

20) and Defendant's Motion to Affirm the Commissioner's Decision ("Defendant's Motion")

(Dkt. No. 26).  The parties have consented to this court's jurisdiction (Dkt. No. 14).  *See* 28

U.S.C. § 636(c); Fed. R. Civ. P. 73.  For the reasons set forth below, the court denies Plaintiff's

motion and grants Defendant's motion.

II.   Legal Standards

A.   Entitlement to DIB and SSI

In order to qualify for DIB and SSI, a claimant must demonstrate that she is disabled

within the meaning of the Social Security Act.[3]  A claimant is disabled for purposes of DIB and

SSI if she "is unable to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of not less than twelve months."  42

U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  A claimant is unable to engage in any substantial

gainful activity when she is not only "unable to do [her] previous work, but cannot, considering

[her] age, education, and work experience, engage in any other kind of substantial gainful work

which exists in the national economy, regardless of whether such work exists in the immediate

area in which [s]he lives, or whether a specific job vacancy exists for h[er], or whether [s]he

would be hired if [s]he applied for work."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).  The

Commissioner evaluates a claimant's impairment under a five-step sequential evaluation process

set forth in the regulations promulgated by the Social Security Administration ("SSA").  *See* 20

C.F.R. §§ 404.1520(a)(4)(i-v), 416.920(a)(4)(i-v).  The hearing officer must determine:  (1)

whether the claimant is engaged in substantial gainful activity; (2) whether the claimant suffers

from a severe impairment; (3) whether the impairment meets or equals a listed impairment

contained in Appendix 1 to the regulations; (4) whether the impairment prevents the claimant

---

[3] There is no challenge to Plaintiff's insured status for purposes of entitlement to DIB, *see* 42 U.S.C. § 423(a)(1)(A), or to her financial need for purposes of entitlement to SSI, *see* 42 U.S.C. § 1381a.

from performing previous relevant work; and (5) whether the impairment prevents the claimant

from doing any work considering the claimant's age, education, and work experience.  *See, e.g.,*

*Goodermote v. Sec'y of Health & Human Servs.*, 690 F.2d 5, 6-7 (1st Cir. 1982) (describing the

five-step process).  If the hearing officer determines at any step of the evaluation that the

claimant is or is not disabled, the analysis does not continue to the next step.  20 C.F.R. §§

404.1520(a)(4), 416.920(a)(4).

Before proceeding to steps four and five, the Commissioner must make an assessment of

the claimant's residual functional capacity ("RFC"), which the Commissioner uses at step four to

determine whether the claimant can do past relevant work and at step five to determine if the

claimant can adjust to other work.  *See id.*

> RFC is what an individual can still do despite his or her limitations.  RFC is an
> administrative assessment of the extent to which an individual's medically
> determinable impairment(s), including any related symptoms, such as pain, may
> cause physical or mental limitations or restrictions that may affect his or her
> capacity to do work-related physical and mental activities.

Social Security Ruling 96-8p, 1996 WL 374184, at *2 (July 2, 1996).

The claimant has the burden of proof through step four of the analysis, including the

burden to demonstrate RFC.  *Flaherty v. Astrue*, Civil Action No. 11-11156-TSH, 2013 WL

4784419, at *8-9 (D. Mass. Sept. 5, 2013) (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th

Cir. 2004)).  At step five, the Commissioner has the burden of showing the existence of jobs in

the national economy that the claimant can perform notwithstanding his or her restrictions and

limitations.  *Goodermote*, 690 F.2d at 7.

B.    Standard of Review

The district court may enter a judgment affirming, modifying, or reversing the final

decision of the Commissioner, with or without remanding for rehearing.  *See* 42 U.S.C. § 405(g).

4

Judicial review "is limited to determining whether the ALJ used the proper legal standards and found facts upon the proper quantum of evidence." *Ward v. Comm'r of Soc. Sec.*, 211 F.3d 652, 655 (1st Cir. 2000).  The court reviews questions of law *de novo*, but "the ALJ's findings shall be conclusive if they are supported by substantial evidence, and must be upheld 'if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion,' even if the record could also justify a different conclusion." *Applebee v. Berryhill*, 744 F. App'x 6, 6 (1st Cir. 2018) (per curiam) (quoting *Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 222-23 (1st Cir. 1981) (citations omitted)).  "Substantial-evidence review is more deferential than it might sound to the lay ear:  though certainly 'more than a scintilla' of evidence is required to meet the benchmark, a preponderance of evidence is not." *Purdy v. Berryhill*, 887 F.3d 7, 13 (1st Cir. 2018) (quoting *Bath Iron Works Corp. v. U.S. Dep't of Labor*, 336 F.3d 51, 56 (1st Cir. 2003)).  *See Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (the threshold for evidentiary sufficiency in substantial evidence review of agency fact finding is not high; it means such evidence as a reasonable mind might accept as adequate to support a conclusion) (citing *Dickinson v. Zurko*, 527 U.S. 150, 153 (1999); *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  In applying the substantial evidence standard, the court must be mindful that it is the province of the ALJ, and not the courts, to determine issues of credibility, resolve conflicts in the evidence, and draw conclusions from such evidence. *See Applebee,* 744 F. App'x. at 6.  That said, the ALJ may not ignore evidence, misapply the law, or judge matters entrusted to experts. *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam).

III.   RELEVANT FACTS

A.   Plaintiff's Background

Plaintiff was forty-eight years old at the time of the hearing.  She was married and lived part-time with her husband (A.R. 60).  She was educated as a bookkeeper (A.R. 62), and, as of the hearing date, was working fifteen to twenty hours a week at a real estate office where she did data entry and miscellaneous office tasks (A.R. 64).

       B.      <u>Relevant Medical Records</u>

Because Plaintiff's claims of error only relate to limitations arising from mental health impairments, the court limits its review of medical records accordingly.

       1.  Sara Steingiser, Ph.D.

Dr. Steingiser of Montague Psychological Associates completed an initial psychiatric evaluation of Plaintiff on January 3, 2017.  In a brief mental status examination, she noted that Plaintiff was calm and cooperative, spoke in a normal tone of voice, was in an anxious and depressed mood, had a normal affect and logical and goal-directed thought process and content, was appropriately oriented, reported that she was distractable, had good insight and impulse control and fair judgment (A.R. 608).

Plaintiff reported that she began having anxiety attacks in her early twenties.  She started taking Xanax, which helped (A.R. 614).  More recently, she was prescribed Alprazolam and Amitriptyline (A.R. 608).  She had previously seen a therapist for counseling and found it helpful.  She had never been hospitalized for emotional problems (A.R. 613).  She had been laid off from her job after Thanksgiving in 2016 because of errors she made that were caused by her anxiety (A.R. 614).  She was having anger problems with her husband and had had trouble with jobs because of difficulty with focus, concentration, and memory (A.R. 615).  Dr. Steingiser diagnosed Plaintiff with panic disorder, rule out generalized anxiety, post-traumatic stress disorder, and depression.  She noted marital discord and family issues, and the loss of Plaintiff's

job and financial worries.  Dr. Steingiser and Plaintiff established short-term goals of therapy on a regular basis, consideration of a medication consultation, a realistic assessment of Plaintiff's job prospects and job search, and exploration of relationship issues.   Long-term goals were noted as improving relationships and anxiety management, decreasing Plaintiff's depressed mood, and improving Plaintiff's job performance.  Dr. Steingiser assigned Plaintiff a current GAF score of 50 (A.R. 609).

At a January 17, 2017, therapy session, Plaintiff reported no change in her symptoms. The focus of the session was issues around work and separating her lack of work from the lack of self-esteem.  Plaintiff and Dr. Steingiser looked at the sources of stress on Plaintiff during the last year and the resulting strain that could affect memory, focus, and concentration.  Plaintiff reported she was looking for jobs and had interviewed (A.R. 617).  Notes from a January 30, 2017, therapy session reflected that Plaintiff had seen her primary care physician, been referred to a neurologist, and discussed medication for anxiety (A.R. 618).  On February 21, 2017, Plaintiff reported that she continued to have difficulty with anxiety, which was increasing.  She was prepared to try Zoloft depending on the neurologist's findings.  Plaintiff had decided to apply for disability because she did not feel able to work full-time.  She was looking for part-time, less detail-oriented work, but had not found anything yet (A.R. 619).  On March 20, 2017, Plaintiff reported feeling slightly more hopeful and that she was taking steps in multiple areas. She was prepared to start taking medication, had recently started a part-time kitchen job, and had addressed some family relationship issues (A.R. 620).  In a March 20, 2017, Psychiatric Disorder form, Dr. Steingiser noted an Axis I diagnosis of panic disorder and assigned her a GAF score of 50.  The form reflected that Plaintiff reported that she started having panic attacks in her early twenties and had difficulty driving and leaving the house.  She started taking Xanax, which

helped (A.R. 586).  Over the years, her anxiety had interfered with her ability to perform detailed work (A.R. 587).  As to Plaintiff's current mental status, Dr. Steingiser stated that Plaintiff was oriented times three, that there was no evidence of a thought disorder, no suicidal ideation, and that she was slightly more hopeful recently.  Plaintiff continued to have problems with focusing and reported memory problems (A.R. 586).

On April 25, 2017, Plaintiff's report was more positive.  She had started taking Setraline (Zoloft) without problems.  She still had the kitchen job, which was challenging physically.  She had started a few hours of office work each week.  The job was low pressure, which helped with anxiety and concentration.  She was less anxious driving and was feeling more hopeful overall (A.R. 621).  On May 16, 2017, Plaintiff reported that she had suffered a panic attack during a job interview and the experience was distressing.  Her PCP had decreased her Zoloft dosage and Plaintiff and Dr. Steingiser discussed whether the reduced dosage was appropriate.  Plaintiff was thinking of leaving the kitchen job, which was physically challenging.  She liked the office work and planned to ask for an increase in her hours in this position (A.R. 622).

On June 13, 2017, Plaintiff appeared for her therapy session in a very distressed state. She was shaking and her breathing was shallow.  She woke up angry at her husband, who had been drinking.  Her brother had died suddenly.  She felt she had struggled over the last years. She reported conflict with her husband, who was not supportive, although her sister and mother had been.  During the session, she was able to use relaxation skills to calm herself; it was the first time she had been able to do so without medication.  Plaintiff had decided to leave the kitchen job, which was too physically demanding and had too much time pressure.  She felt better at the desk job.  She reported feeling happy for a few days at work.  Plaintiff and Dr. Steingiser

discussed Plaintiff's Zoloft dosage and whether music and chatter in her head might be a side effect (A.R. 623-24).

Plaintiff arrived late for her July 11, 2017, appointment, reporting that she had been having trouble getting out of bed. Dysfunction in her family had increased and she was feeling guilty about doing better in her life than other family members. She was planning to go away with her mother for a few days (A.R. 626). Plaintiff cancelled her August 1, 2017, psychotherapy session (A.R. 627).

On August 22, 2017, Plaintiff reported that she continued to have periods of high anxiety and panic attacks. She tried to go on a vacation with her mother and a friend and needed to leave. She had difficulty standing up for herself and setting limits with her mother, and then had a panic attack. She was seeing her primary care provider the next day to increase her Zoloft dosage (A.R. 116).[4]

On September 12, 2017, Plaintiff reported an increase in her Zoloft prescription, no negative side effects, and some decrease in her anxiety level. She reported finding that she was able to assert herself more often, had increased self-awareness, and had decided to stay in her present job, recognizing that the type of person for whom she had worked in the past had caused problems (A.R. 117). On October 17, 2017, Plaintiff reported that during the day, the Zoloft helped her feel a little more in control. She felt overwhelmed and had experienced panic attacks

---

[4] Dr. Steingiser's notes of therapy sessions with Plaintiff on August 22, September 12, and October 17, 2017, were not submitted to the ALJ, who noted and relied on a "significant break in therapy from August of 2017 until November of 2017" in his decision (A.R. 25). In the Appeals Council's May 6, 2020, notice of action, as to these notes, the Appeals Council stated that "it found this evidence [did] not show a reasonable probability that it would change the outcome of the decision" (A.R. 2). For purposes of discussing the issues raised by Plaintiff, the court includes the contents of the notes that precede the date on which the hearing decision was issued (Dkt. No. 27 at 7-8).

at work that she thought related to having to drive home.  This had been her problem for many years.  She was trying to stay with her medications even though they caused cloudy thinking and fatigue.  There were problems with her family (A.R. 118).

On November 17, 2017, Plaintiff reported that she felt tired, had difficulty driving in the afternoon and getting to work on time, was suffering from anxiety, and had trouble motivating herself to do what needed to be done.  She felt that her medication was helping, but not enough. She was troubled by family issues (A.R. 641).  On November 28, 2017, Plaintiff reported increased distress due to marital discord.  Her husband was sometimes verbally abusive, but she did not want to leave the marriage.  Her boss at work wanted her to learn a new program and she was very anxious about the request (A.R. 642).  On January 22, 2018, Plaintiff called to check on the time of her appointment.  On January 23, 2018, she did not appear for therapy (A.R. 643). On April 3, 2018, Plaintiff did not call and did not appear at another therapy session (A.R. 644).

In early May 2018, Dr. Steingiser received a telephone call from Carol Rice at Winchendon Health Center, who indicated she was concerned about Plaintiff and asked Dr. Steingiser to give Plaintiff a call.  Dr. Steingiser left Plaintiff two messages (A.R. 645) and saw her for a therapy session on May 15, 2018, when Plaintiff reported that her anxiety was getting better, but she had experienced other problems, including excessive alcohol consumption, verbal, emotional and physical abuse by her husband, and admission to the hospital more than once for a serious medical condition (A.R. 646).

On May 22, 2018, Plaintiff reported elevated anxiety levels.  She was taking Amitriptyline to help her sleep and had difficulty getting up in the morning.  She was worried about her job.  She was trying to cut down on drinking alcohol but did not feel able to give it up. At home, she was keeping to herself and avoiding her husband.  She frequently went to stay with

others and felt safe (A.R. 647).  Plaintiff missed her June 19, 2018, appointment (A.R. 648) and, so far as appears from the record, did not return to therapy until October 22, 2018 (A.R. 649).

On October 22, 2018, Plaintiff reported that she was still working.  She had driven herself to the hospital with an attack of pancreatitis and been told that if she did not stop drinking, she would die.  She had taken a drink and had a strong reaction.  She used to use drink to cope and now she could not do that.  She felt as though everything was coming at her.  She wanted to work on staying sober and dealing with her husband, possibly by divorce.  Dr. Steingiser recommended that Plaintiff engage in therapy on a weekly or biweekly basis so she could work on her issues in a more structured way.  When Plaintiff said she would think about that commitment, Dr. Steingiser suggested that Plaintiff consider finding a therapist who was closer to her work.  Plaintiff was hesitant to try this because she found it difficult to make a new connection (A.R. 649-50).

2.  Winchendon Health Center ("Winchendon")

On May 13, 2016, Plaintiff saw Carol Reich, a family nurse practitioner at Winchenden, for an annual examination.  She reported that she felt well with minor complaints and had good energy and was sleeping well.  She worked full time.  She used Xanax for anxiety, which she experienced daily.  Ms. Reich included panic disorder, sleep disorder, depression, anxiety, and fatigue on the list of Plaintiff's past medical problems (A.R. 554).  At this visit, Ms. Reich noted anxiety, but that Plaintiff felt safe at home.  She was not experiencing depression or insomnia.  In terms of mental status, she was alert.  She appeared well-groomed, not anxious, depressed, or in acute distress (A.R. 552, 554-55).

When Plaintiff presented on January 20, 2017, for a recheck of her arthritis, she reported to Ms. Reich that she had trouble concentrating because of anxiety but had never felt comfortable

taking daily medication.  She took Xanax when her anxiety was especially bad.  She also reported forgetfulness that she believed was related to her anxiety.  She was seeing a therapist (A.R. 550).  On examination, Ms. Reich noted that Plaintiff was anxious, well-groomed, not depressed or in acute distress (A.R. 551).  Ms. Reich discussed medication options for anxiety with Plaintiff, who preferred to wait until after a neurology appointment (A.R. 552).  On February 1, 2017, after a telephone call during which Plaintiff reported difficulty concentrating and anxiety, Ms. Reich referred her to a neurologist (A.R. 601).

On March 23, 2017, Plaintiff returned for treatment with Ms. Reich, concerned about her ability to concentrate and following consultations with a neurologist and a psychiatrist (A.R. 595).  Plaintiff had decided that she needed to address her anxiety, that Xanax was not a solution, and that she should try Zoloft (A.R. 595).  On examination, Plaintiff was anxious, well-groomed, not depressed, and not in acute distress.  Ms. Reich conducted a mental status examination, noting that Plaintiff's speech and thought content were normal and there was no evidence of hallucinations, delusions, obsessions or suicidal or homicidal ideation.  She was able to recall recent and remote events, her fund of knowledge was intact, and her attention span and ability to concentrate were normal.  Her insight was appropriate.  Her mood and affect were anxious (A.R. 596).  Plaintiff agreed to try Zoloft (A.R. 597).

Plaintiff returned to treat with Ms. Reich on May 10, 2017, reporting that Zoloft seemed to be helping.  The result of the mental examination was the same as on March 23, 2017, except that Plaintiff's mood and affect were noted as not anxious.  She was working two jobs and felt good that she was able to manage (A.R. 59-93).

At Plaintiff's annual examination on August 23, 2017, she felt well with minor complaints (A.R. 680).  Her mental status examination was normal, including her mood and

affect, which were described as not anxious (A.R. 682).  Plaintiff reported that she wanted to increase her Zoloft dosage to deal with anxiety.  She had increased her consumption of alcohol (A.R. 680).

On October 6, 2017, Plaintiff reported to Ms. Reich that she had not been doing well with regard to anxiety.  She was having panic attacks when she thought about driving home.  She was working fifteen hours a week and felt she could not manage much more.  She used alprazolam sparingly and tried to rely on relaxation techniques her therapist taught her.  She acknowledged that the Zoloft had helped overall, but it was not enough.  She had days when she felt very down and did not want to leave the house, although she continued to go to work (A.R. 678).  Ms. Reich increased Plaintiff's Zoloft dosage and prescribed buspirone for breakthrough anxiety (A.R. 679).

On November 17, 2017, Plaintiff reported that she had had a few recent setbacks with anxiety increasing but had made some improvements and was doing a little better.  She had stopped taking buspirone because she thought it made her dizzy.  She thought the Zoloft helped considerably with managing her anxiety but did not want to increase the dosage.  She had been able to get to her part-time job but continued to have a lot of anxiety connected to driving (A.R. 676).

On January 15, 2018, Plaintiff returned to Winchendon after hospitalization for acute pancreatitis.  She had been drinking heavily through most of December 2017, before which she had been working hard to control her anxiety.  She had some increased symptoms and turned to alcohol.  She reported that she had continued in therapy and had an upcoming appointment with Dr. Steingiser (A.R. 674).  Ms. Reich started Plaintiff on hydroxyzine for anxiety on an as-needed basis (A.R. 675).

On March 6, 2018, Plaintiff returned to Winchendon to follow up on anxiety and alcohol abuse. She reported that she continued to struggle with anxiety. She continued to take Zoloft and thought the medication was helping. She was also taking alprazolam and had added a tablet of hydroxyzine in the afternoon which helped a little. She continued to struggle with excessive drinking. On examination, she was anxious but not depressed or in acute distress. She had missed work recently because of a urinary tract infection (A.R. 670-71). On May 1, 2018, Ms. Reich saw Plaintiff again. She continued to struggle with anxiety, but said she was adequately managing this condition at this point. She had not seen her therapist recently (A.R. 667). On examination, Ms. Reich noted anxiety and depression. Plaintiff felt safe at home and had no hallucinations or suicidal ideation (A.R. 668).

Plaintiff returned to see Ms. Reich at Winchendon on September 28, 2018, for an annual physical. She reported that she felt well with minor complaints and her overall outlook had improved. She had been sober for about two months and had not seen her therapist since before her hospitalization for acute pancreatitis (A.R. 664). The results of the mental status examination were normal, including mood and affect (A.R. 665). Plaintiff reported that Zoloft was effective. Ms. Reich recommended that Plaintiff resume meeting with her therapist (A.R. 666).

 On February 1, 2019, Plaintiff reported that she was estranged from her husband and felt that many of her issues stemmed from her difficult relationship with him. Her anxiety level remained high, but she was coping. She was able to get to her part-time job more consistently. Although her Zoloft dosage had previously been increased, she had not been taking the higher dose. It was recommended that she take amitriptyline at night for sleep. She had not been attending sessions with her therapist because she had trouble getting to the appointments (A.R.

683).  Her mental status examination was again normal in all respects, including mood and

affect.  Ms. Reich increased Plaintiff's Zoloft dosage and recommended that she begin

counselling at Clinical & Support Options and consider seeing a mental health prescriber once

counselling was underway (A.R. 687).

On April 5, 2019, Plaintiff returned to see Ms. Reich at Winchendon and reported that the

increased Zoloft dosage was helping.  She was feeling a little less anxious.  She was seeing a

mental health counselor.  She reported that she was still struggling with her relationship with her

husband and not returning to their house often (A.R. 712).  The results of the mental status

examination were reported as normal (A.R. 713).

3.      Clinical & Support Options (CSO)

Plaintiff presented at CSO for an initial comprehensive assessment on February 28, 2019,

which was conducted by Natalla Cascio, LMHC.  Plaintiff reported symptoms of major

depression and anxiety and wanted to establish a relationship with a psychologist in the Gardner

area (A.R. 693).  She had previously treated with a psychologist in Montague and found

medication and therapy helpful (A.R. 696).  Plaintiff said she had a physically and emotionally

abusive relationship with her husband and that she often spent time away from her home to avoid

him.  She had struggled with severe alcoholism from 2017 to 2018, when her health had been

compromised by her drinking.  She reported being sober since August 2018 (A.R. 693).

Ms. Cascio conducted a mental status examination, finding that Plaintiff's appearance

and clothing, eye contact, affect, perception, thought content and process, intellectual

functioning, orientation, memory, and insight were within normal limits.  Plaintiff's behavior

was cooperative, but she was nervous and anxious and unable to perceive pleasure.  Her facial

expression displayed anxiety, apprehension, sadness, and depression.  She described herself as

depressed and sad and her ability to make reasonable decisions was mildly impaired (A.R. 699).

In assessing Plaintiff's strengths, Ms. Cascio noted that she was friendly, polite, and able to

communicate her needs effectively.  She enjoyed playing games, spending time with family and

her dogs, going to the movies, and going out to eat.  She had a positive support system in her

family.  She worked part-time but was on leave (A.R. 700).  Ms. Cascio diagnosed generalized

anxiety disorder; rule out unspecified bipolar and related disorder; and alcohol use disorder in

early remission.  She concluded that Plaintiff would benefit from outpatient therapy and

transferring her medication services to CSO for coordination (A.R. 701).

On March 8, 2019, Ms. Cascio focused on building a relationship with Plaintiff.  There

were no significant changes reported or observed from the initial evaluation (A.R. 703).  On

April 5, 2019, Plaintiff reported that she was only spending three nights a week at home because

she continued to have issues with her husband.  She had met with a divorce attorney and was

talking about pursuing divorce to get out of the abusive relationship.  Again, Ms. Cascio noted

that there were no significant changes or observations reported.  Plaintiff asked for a medication

referral (A.R. 708).

On April 19, 2019, Plaintiff presented for a therapy session as highly anxious, restless,

with a tangential and loose thought process and orientation.  She had met with her disability

lawyer a few days earlier and had been highly anxious since that meeting.  She remained in her

abusive marriage.  She hoped to be granted disability so that she could divorce her husband

(A.R. 715).  Plaintiff and Ms. Cascio established as goals that Plaintiff would identify underlying

issues of codependency and trauma so that she could address her abusive relationship; explore

patterns of irrational thinking; develop strategies to manage symptoms of anxiety and depression

and improve her overall mood; and address medication management (A.R. 716-17).  At her next

appointment on May 3, 2019, Plaintiff reported that she recently had a hearing in her disability

case and that her lawyer thought it had gone well.  She reported that her husband was drinking

and being verbally and emotionally abusive, and that she was hoping her disability application

would be successful so she could leave her husband (A.R. 718).  No significant changes in her

condition were noted or reported (A.R. 718).  Assessed needs and goals remained the same (A.R.

719-20).[5]

      C.    <u>Opinion Evidence</u>

          1.  State Agency Assessments

              a.  DIB and SSI- Initial

On May 22, 2017, Joseph Litchtman, Ph.D., completed a disability assessment of

Plaintiff's mental health impairments for purposes of her DIB and SSI claims.  Based on a record

review, Dr. Lichtman concluded that Plaintiff had severe anxiety and obsessive-compulsive

disorder (A.R. 138).  In his opinion, the condition caused a mild impairment in Plaintiff's ability

to understand, remember, or apply information; a mild impairment in her ability to interact with

others; a moderate impairment in her ability to concentrate, persist, or maintain pace; and a

moderate impairment in her ability to adapt or manage herself (A.R. 125, 139).  In the mental

residual functional capacity assessment, Dr. Lichtman found that Plaintiff did not have

understanding or memory limitations.  She was moderately limited in her ability to maintain

attention and concentration for extended periods, and in her ability to complete a normal

---

[5] The ALJ issued the decision denying benefits on June 5, 2019 (A.R. 29).  After the hearing,
Plaintiff's counsel submitted additional records, a number of which postdated the ALJ's decision
(Dkt. No. 16 at 2).  In its denial letter, the Appeals Council declined to consider the records on
the ground that the additional evidence did not relate to the period at issue (A.R. 2).  The court
addresses these records in connection with its discussion of Plaintiff's arguments for reversing
the Commissioner's decision.

workday without interruptions for psychologically based symptoms, and to perform at a consistent pace but could sustain concentration to perform simple tasks for two-hour time spans (A.R. 129-30, 132, 143-44, 146).  She was moderately limited in her ability to respond appropriately to changes in the work setting but could adapt successfully to minor changes and to major changes when she had more time to adjust (A.R. 130, 144).  Dr. Lichtman concluded that Plaintiff was not disabled.

>    b.   DIB and SSI – Reconsideration

On August 7, 2017, Joan Kellerman, Ph.D., reconsidered the disability assessment, again based on a record review (A.R. 156, 171).  Dr. Kellerman agreed with Dr. Lichtman that Plaintiff had severe anxiety and obsessive-compulsive disorder.  She found that Plaintiff was somewhat more limited by her mental health impairment than did Dr. Lichtman.  Dt. Kellerman concluded that Plaintiff's mental health impairment caused mild limitations in her ability to understand, remember, or apply information; mild limitations in her ability to interact with others; moderate limitations in her ability to concentrate, persist, or maintain pace; and moderate limitations in her ability to adapt and manage herself (A.R. 155, 170).  Nonetheless, Dr. Kellerman's residual functional capacity assessment matched Dr. Lichtman's assessment and she too concluded that Plaintiff was not disabled (A.R. 160-61, 175-76).

>    2.   Dr. Steingiser's Residual Functional Capacity Assessment

On November 17, 2017, Dr. Steingiser completed a mental residual functional capacity report of Plaintiff's condition.  The first portion of the assessment was in checkmark form.  In this portion of the assessment, Dr. Steingiser reported that Plaintiff was not significantly limited in her ability to remember locations and work-like procedures; understand and carry out very short and simple instructions; sustain an ordinary routine without special supervision; make

simple work-related decisions; interact appropriately with the general public; ask simple questions or request assistance; get along with coworkers without distracting them; maintain socially appropriate behavior and personal appearance; be aware of hazards and take appropriate precautions; and set realistic goals and plans independently of others (A.R. 628-29).  Dr. Steingiser found Plaintiff to be moderately limited in her ability to understand and remember detailed instructions; carry out detailed instructions; perform activities within a schedule, maintain regular attendance, and be punctual; work in proximity to and in coordination with others; accept instructions and respond appropriately to criticism from supervisors; and respond appropriately to changes in the work setting (A.R. 628-29).  Dr. Steingiser deemed Plaintiff markedly limited in her ability to maintain attention and concentration for extended periods; complete a normal workweek without interference from mental health symptoms and perform at a consistent pace; and travel to unfamiliar places or use public transportation (A.R. 628-29).

In the narrative section of the assessment, Dr. Steingiser reported that Plaintiff's high level of anxiety had "significantly impacted" her functioning on the job, interfering with her ability to focus and concentrate and deal with criticism.  She noted that Plaintiff experienced anxiety throughout the day, which increased with any pressure on the job.  Finally, Dr. Steingiser stated that Plaintiff's anxiety was not limited to the work environment and that it occurred at similar levels in social settings and at home (A.R. 630).

    D.   <u>Hearing Testimony</u>

At the hearing, it appeared that Plaintiff considered anxiety and trauma in response to abuse from her husband to be her most limiting impairments (A.R. 68, 74).  She testified that she was diagnosed with severe anxiety for which she was prescribed Sertraline and other medications (A.R. 71).  Her anxiety never went away, and she had been dealing with it for many

years (A.R. 71-72).  In addition to anxiety, she was being treated for trauma arising from her

husband's abuse (A.R. 72).  Plaintiff testified that her anxiety was limiting because she did not

want to get up and had trouble convincing herself that she could perform simple tasks such as

driving.  Some days, she just avoided dealing with anything (A.R. 74).  In terms of activities of

daily living, Plaintiff testified that she lived part-time at the house she owned with her husband

but spent about half the time staying with her family or a friend to avoid her husband (A.R. 75).

When she was home, she did the dishes and cooked (A.R. 76).  She went grocery shopping but

sometimes had to leave the store before she finished because of anxiety (A.R. 76).  She found

leaving the house, driving, and trying to keep it together all day very challenging (A.R. 76).  She

was happy at her family's lake house, where she read and visited with her sisters.  She spent time

on the internet (A.R. 77-78).  On a typical day, she got up around 8:30 or 9:00 a.m., showered,

went to work for up to five hours (at an undemanding job where the supervisor was a friend of

her family), then went over to a friend's or her sister's house and spent the evening watching

something on Netflix or the news.  She took Amitriptyline to help her sleep (A.R. 79, 85).  She

tried to go to events on weekends with supportive friends (A.R. 80).  She had lost a series of jobs

when she made mistakes because the jobs were demanding (A.R. 82-84).  Her current position

was with a realty company run by someone who knew her mother.  Her tasks were simple.

There was not enough work for a full-time position, and she could barely manage what she was

doing (A.R. 85-87, 89-90).  Plaintiff described panic attacks, which she had several times each

week (A.R. 86-87).  Her anxiety limited her ability to drive (A.R. 88-89).  She testified that she

missed work two to three days each month.  In conclusion, Plaintiff told the ALJ that she had

suffered from anxiety for many years and was trying to get help, but it had gotten to the point

where she could not deal with it anymore (A.R. 96).

Insofar as pertinent to this appeal, the ALJ asked the vocational expert ("V.E.") to assume a hypothetical individual "of [Plaintiff's] age, education, work experience, who [was] limited to … simple, unskilled work, low stress job, which [he] define[d] as jobs with only occasional decision making, only occasional changes in the work setting" (A.R 103).  Asked whether there were sedentary positions in the national economy that such an individual could perform, the V.E. identified: table work, DOT code 739.687-182, of which there were 2,900 positions nationally; sorter, DOT code 209.687-022, of which there were 49,000 positions nationally; and surveillance systems monitor, DOT code 379.367-010, of which there were 9,200 positions nationally (A.R. 103-04).  The V.E. testified that there would be no work available for an individual who was consistently late for work at least twice a week or missed two to three days of work each month or was unable to consistently engage in sustained work activity during an eight-hour day (A.R. 104-05).

E.    ALJ Decision

The ALJ conducted the requisite five-step sequential analysis.  He found that Plaintiff met the insurcd status requirements through December 31, 2021, and that, although Plaintiff had earnings, she had not engaged in substantial gainful activity after the claimed onset of disability (A.R. 18-19).  He found that Plaintiff had the following severe impairments: "lumbar spine disorder, with multi-level facet hypertrophy; obesity; mild degenerative disc disease of the cervical spine at C6-C7; degenerative joint disease of the knee; asthma; history of reactive airway disease; bilateral lower extremity sensory neuropathy; and alcoholic pancreatitis" (A.R. 19).

While the list of severe impairments found by the ALJ did not include any mental health impairments, this was apparently an oversight because the ALJ proceeded to consider whether

Plaintiff's "mental impairments, considered singly or in combination, … [met] or medically equal[ed] the criteria of listings 12.04 and 12.06" and concluded that they did not (A.R. 20).[6]  In making this finding, the ALJ found that Plaintiff had a moderate limitation in understanding, remembering, or applying information (A.R. 21).  Based on evidence about the extent of her social activities and her providers' notes about her polite and friendly demeanor, he found that she had no more than a mild limitation in her ability to interact with others (A.R. 21).  With regard to concentrating, persisting, or maintaining pace, he found that Plaintiff had a moderate limitation.  He based this finding on evidence that she performed data entry tasks at her job and was able to drive but reported panic attacks and difficulty concentrating and finishing tasks (A.R. 21).  He further found that she had moderate limitations in adapting and managing herself.  He noted that Plaintiff was able to perform some activities of daily living such as cleaning, cooking, and tending to her personal care, was working part-time, and had not required hospitalization for mental health related problems, nor had she experienced episodes of decompensation.  He concluded she had limitations in this area because of her reported anxiety symptoms and her difficulty in adapting to change (A.R. 21).  Because he did not find two areas of marked limitation, or any single area of extreme limitation, he concluded that the paragraph B criteria were not satisfied.  He noted no evidence in the record to satisfy the paragraph C criteria (AR. 21-22).

The ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause her alleged symptoms but that her statements about the intensity, persistence, and limiting effect of the symptoms were not entirely consistent with the medical and other

---

[6] Listing 12.04 sets out the criteria for disabling depressive, bipolar, and related disorders. Listing 12.06 sets out the criteria for disabling anxiety and obsessive-compulsive disorders.

evidence in the record (A.R. 23).  The ALJ noted that in a psychological screening form Plaintiff

completed in April 2016 in anticipation of bariatric surgery, she reported some moderate anxiety-

related symptoms (A.R. 25, 546).  In the same form, she reported mild depressive symptoms

(A.R. 25, 547).  Beginning in January 2017, she reported trouble concentrating, being forgetful

due to anxiety (A.R. 25, 550, 595, 615, 712), experiencing panic attacks from anxiety (A.R. 25,

622, 678), having difficulty getting out of bed due to increased depression (A.R. 25, 678), and

being stressed out by changes at work and home (A.R. 25, 641-42).  Treatment notes, however,

reflected Plaintiff's positive response to medication and psychotherapy and an absence of trips to

the emergency room for panic attacks (A.R. 25).  The results of mental status examinations were

also fairly benign, and she was able to work on a part-time basis.  For these reasons, the ALJ

found that the accommodations for Plaintiff's mental health impairments in the RFC were

consistent with her functional capacity for work (A.R. 25).

The ALJ found support for his conclusions in the assessments by the state agency

psychological consultants and gave their opinions "the most weight" (A.R. 26).  He noted that,

while the consultants did not have access to the entire record, they had access to much of the

relevant evidence and there were minimal changes to Plaintiff's mental status examination

results in records generated after the dates of the state agency assessments (A.R. 26).  The ALJ

noted that the state agency psychological consultants were well-qualified medical sources who

relied on their clinical backgrounds and familiarity with the disability program to formulate their

opinions (A.R. 26).  He gave little weight to the form Dr. Steingiser filled out on March 20,

2017, noting that the form was largely a report of Plaintiff's subjective reports and that a GAF

score of 50 had limited probative value (A.R. 26).  He gave less weight to the November 2017

opinions of Dr. Steingiser than he did to the state agency psychologists' opinions because Dr.

Steingiser's opinions were not wholly consistent with Plaintiff's ability to work part-time, did

not account for the evidence that her anxiety responded to treatment, and were not entirely

consistent with the longitudinal medical record as a whole (A.R. 27).

Relying on the V.E.'s testimony and the RFC he had crafted, the ALJ found that there

were jobs available in the national economy that Plaintiff would be capable of performing (A.R.

27-29).

IV.   <u>ANALYSIS</u>

"The 'claimant bears the burden of proving the limitations that factor into the

Commissioner's residual functional capacity finding.'"  *Simons v. Colvin*, CIVIL ACTION NO.

13-11668-MBB, 2015 WL 4275252, at *19 (D. Mass. July 15, 2015) (quoting *Bard v. Soc. Sec.*

*Admin. Comm'r,* 736 F. Supp. 2d 270, 276 (D. Me. 2010)).  To succeed on her claim that the ALJ

erred in formulating the RFC, "Plaintiff must show not only the existence of evidence in the

record *supporting* her position but must also demonstrate the evidence relied on by the ALJ is

either insufficient, incorrect, or both."  *Greene v. Astrue,* Civil Action No. 11-30084-KPN, 2012

WL 1248977 at *3 (D. Mass. Apr. 12, 2012).

Plaintiff raised five arguments as to why the RFC was not based on substantial evidence

in the record.  First, she pointed to the additional records that she submitted to the Appeals

Council on September 17, 2019, which showed, among other things, that the ALJ's reliance on a

break in her treatment with Dr. Steingiser was in error.  She further argued that the records she

submitted to the Appeals Council, including an assessment for ADHD performed three months

after the hearing, supported her contention that her limitations arising from mental health

impairments made her unable to engage in substantial gainful activity.  Second, she argued that

the ALJ erred when he did not give controlling weight to Dr. Steingiser's opinion evidence.

Third, she contended that the ALJ erred by relying on her ability to work part-time as evidence that she could perform substantial gainful activity.  Fourth, she argued that the ALJ failed adequately to justify his reliance on the vocational expert's testimony that there were jobs in the national economy that Plaintiff could perform.  Finally, she urged the court to keep the record open through her fiftieth birthday and find that she was entitled to benefits as of that date as a matter of law.  The court addresses these contentions in turn.

1.  The Appeals Council was not egregiously mistaken in declining to
consider the new evidence submitted by Plaintiff

Concluding that there was no reasonable probability that Plaintiff's notes of treatment with Dr. Steingiser from August 2017 through October 17, 2017, and the CSO record from May 22, 2019, would change the outcome of Plaintiff's benefits applications, the Appeals Council declined to consider these records (A.R. 2).  Plaintiff also submitted post-hearing CSO records from June 14 through July 12, 2019, and records of an assessment performed by George Bozicas, Ph.D., between May 10 and July 12, 2019, culminating in a July 18, 2019, report (A.R. 51-53). In the report, Dr. Bozicas diagnosed Plaintiff with generalized anxiety disorder, alcohol use disorder, severe, in remission, and ADHD, predominantly inattentive presentation (A.R. 530). The Appeals Council declined to consider these records on the grounds that the records did not pertain to the relevant period (A.R. 2).

This court does not weigh evidence that the ALJ never saw when determining whether the ALJ's decision was supported by substantial evidence and cannot take into account the supplemental evidence Plaintiff submitted to the Appeals Council.  *See Mills v. Apfel*, 244 F.3d 1, 4 (1st Cir. 2001) ("The ALJ can hardly be expected to evaluate or account for evidence that he never saw.").  The Appeals Council may choose to take such supplemental evidence into account.  Generally, a decision by the Appeals Council to deny review of an ALJ's decision is

unreviewable by a court because an error by the ALJ can be remedied by the court.  *See*

*Arrington v. Colvin*, 216 F. Supp. 3d 217, 231 (D. Mass. 2016) (quoting *Moore v. Astrue*, Civil

Action No. 11-cv-11936-DJC, 2103 WL 812486, at \*14 (D. Mass. Mar. 2, 2013)).  The First

Circuit, however, "has held that an Appeals Council decision may be reviewable 'where new

evidence is tendered after the ALJ decision,'" *id.* (quoting *Mills*, 244 F.3d at 5), and the claimed

error is based on the failure to consider this supplemental evidence.  *See also Cookson v. Colvin*,

111 F. Supp. 3d 142, 149 (D.R.I. 2015).  "In such circumstances, the Appeals Council's refusal

to review the ALJ 'may be reviewable [by the court] to the extent that it rests on an explicit

mistake of law or other egregious error.'" *Arrington*, 216 F. Supp. 3d at 231 (alteration in

original) (quoting *Mills*, 244 F.3d at 5).  This avenue of review has been described as

"exceedingly narrow."  *Harrison v. Barnhart*, Civil Action No. 06-30005-KPN, 2006 WL

3898287, at \*2 (D. Mass. Dec. 22, 2006).

     The Appeals Council did not commit an error of law or an egregious mistake when it

declined to review the ALJ's decision based on the supplemental information submitted by

Plaintiff.  As the Commissioner acknowledges (Dkt. No. 27 at 13-14), the ALJ relied in part on a

three-month gap in Plaintiff's counseling relationship with Dr. Steingiser as a factor supporting

the RFC (A.R. 25).  The records of the three counseling sessions that were not before the ALJ

were, however, generally consistent with the records that the ALJ reviewed in terms of the levels

of functional impairment they showed, and the reasons for that degree of impairment.  In August

2017, Plaintiff reported panic attacks brought on by interactions with family members.  There

was no change in diagnosis.  In September 2017, Plaintiff reported some decrease in anxiety

levels, increased self-awareness, and a decision to stay in her present job (A.R. 116-17).  In

October, Plaintiff reported that she felt her anxiety was controlled a little better during the day by

Zoloft but had panic attacks in anticipation of the drive home.  She reported that issues at home were stressful (A.R. 118).  In May 2019, when Plaintiff met with a clinical nurse specialist for psychiatric and medication review, the report of the mental status examination was that Plaintiff was alert, cooperative, oriented in all spheres, made good eye contact, had no cognitive disturbances, and had good insight and judgment (A.R. 35-36).

Moreover, this assumed gap in treatment was only one of the factors on which the ALJ relied in support of the RFC.  He also took into account Plaintiff's ability to work, albeit part-time in an undemanding position, entries in her medical records that showed that she responded to treatment for her anxiety, and the lack of any hospitalizations for anxiety attacks or any other mental health impairment.  On this record, the court cannot find that it was an egregious mistake for the Appeals Council to conclude that these counseling records did not materially change the record and to deny review of Plaintiff's case.  *See Mills*, 244 F.3d at 6; *Arrington*, 216 F. Supp. 3d at 231; *Cookson*, 111 F. Supp. 3d at 149-50 (the court affirmed the denial of benefits where the Appeals Council found, after reviewing the new evidence submitted by the claimant, that the documents "did not add anything new and material to the evidence").

Nor was it an egregious error for the Appeals Council to exclude records of treatment or diagnosis that post-dated the ALJ's decision.  SSA regulations provide that the Appeals Council will only consider additional evidence that was not before the ALJ if it relates to the period on or before the date of the ALJ's decision.  *See Saenz v. Colvin*, 61 F. Supp. 3d 195, 205 (D. Mass. 2014); 20 C.F.R. § 404.970(a)(5).  Plaintiff has not shown that the records related to the diagnosis of ADHD were pertinent to the relevant period.  Furthermore, even if the July 18, 2019, diagnosis of ADHD could be deemed to relate to the relevant period, which is not borne out by a document that arguably purports to diagnose Plaintiff as having had ADHD throughout

her life, including when she worked full time (A.R. 53), the report does not identify any functional limitations on Plaintiff's ability to work that are attributable to this diagnosis (A.R. 51-53).  A diagnosis alone does not support a conclusion that an impairment is severe or gives rise to functional limitations.  *See Campos v. Colvin*, No. CA 13-216 ML, 2014 WL 2453358, at *16 (D.R.I. June 2, 2014) (a mere diagnosis of a mental health impairment does not support a finding that an impairment is severe) (citing *Evans v, Astrue*, No. CA 11-146 S, 2012 WL 4482366, at *11 (D.R.I. Aug. 23, 2012)).

The Appeals Council's assessment of the additional evidence and its decision to decline review of Plaintiff's case was not the rare egregious error that warrants reversal or remand.

>2.  The ALJ did not err by giving greater weight to the opinions of the state agency mental health consultants than to the opinions of Plaintiff's treating mental health care provider.

>An ALJ should give controlling weight to a treating [psychologist's] opinion if it is "well-supported by medically acceptable clinical and diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. § 404.1527(c)(2)).  If the ALJ determines that the treating [psychologist's] opinion is not entitled to controlling weight, the ALJ must determine the amount of weight the opinion is entitled to based on the following six factors: (1) "[l]ength of treatment relationship and the frequency of examination," (2) [n]ature and extent of the treatment relationship," (3)"[s]upportability" of the medical opinion, (4) consistency of the opinion "with the record as a whole," (5) "[s]pecialization" of the treating source, and (6) other factors … that tend to support or contradict the opinion."  *Id.* § 404.1527(c).  In addition, the Commissioner must always give good reasons in his notice of decision for the weight he gives a claimant's treating source's opinion.  Giving "good reasons" means providing specific reasons that will allow subsequent reviewers to know the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."  *Haggblad v. U.S. Soc. Sec. Admin., [Comm'r]*, [Civil No.] 11-28-JL, 2011 WL 6056889 (D.N.H. Nov. 17, 2011) (citations, internal quotation marks and alterations omitted), *report and recommendation adopted* sub nom. *Haggblad v. U.S. Soc. Sec. Admin., [Comm'r]*, [Civil No. 11-JL, 2011 WL 6057750 (D.N.H. Dec. 6, 2011).

*Simumba v. Colvin*, Civil Action No. 12-30180-DJC, 2014 WL 1032609, at *7 (D. Mass. Mar. 17, 2014) (second, fourth, fifth, sixth, seventh, and eighth alterations in original).[7]  "The ALJ is not required to discuss each factor under 20 C.F.R. § 404.1527(c) in [his] decision, so long as []he gives good reasons, supported by the evidence in the record, for the weight []he ultimately gives to the treating [psychologist's] opinion."  *Id.* (citing *Delafontaine v. Astrue*, Civil No. 1:10-cv-027-JL, 2011 WL 53084, at *14 (D.N.H. Jan. 7, 2011); *Crocker v. Astrue*, No. 07-220-P-S, 2008 WL 2775980, at *9 (D. Me. June 30, 2008); *Braley v. Barnhart*, No. 04-176-B-W, 2005 WL 1353371, at *4 (D. Me. June 7, 2005)).  It is the ALJ's responsibility to resolve the conflicts in the evidence and to draw reasonable inferences from the record.  *See, e.g., Bourinot v. Colvin*, 95 F. Supp. 3d 161, 182 (D. Mass. 2015).

The ALJ's explanation of the reasons why he gave little weight to Dr. Steingiser's March 20, 2017, psychiatric disorder form and the GAF score of 50 assigned therein were properly based on factors in the SSA regulations.  He grounded this aspect of his decision on the length of the treatment relationship when the form was completed – only three months – and the fact that the form reflected Plaintiff's subjective complaints rather than Dr. Steingiser's opinions.  The ALJ noted that he had considered these subjective complaints in his evaluation of Plaintiff's benefits applications but was not assigning them controlling weight as treating care provider opinions because they were subjective complaints rather than opinions (A.R. 26).  *See Patoski v. Berryhill*, 320 F. Supp. 3d 283, 292-93 (D. Mass. 2018) (holding that the ALJ properly

---

[7] For applications filed on or after March 27, 2017, SSA regulations altered the standards by which adjudicators are to assess medical opinion evidence.  The change in regulations did away with the long-standing rule that opinion evidence from an acceptable source was entitled to controlling weight.  *See, e.g., Richardson v. Saul*, 565 F. Supp. 3d 154, 166-67 (D.N.H. 2021) (citing *Nicole C. v. Saul*, C.A. No. 19-127JJM, 2020 WL 57727, at *4 (D.R.I. Jan. 6, 2020)) (citing 20 C.F.R. § 404.1520c(a)).  Plaintiff applied for DIB on February 28, 2017, and for SSI on March 6, 2017.  The new regulations do not apply to this case.

discounted opinions from treating physicians based on the limited duration of the treatment relationships); *Deane v. Colvin*, 247 F. Supp. 3d 152, 166 (D. Mass. 2017) (stating that the claimant's description of his habits that were reported by a treating care provider did not qualify as a medical opinion of the treating care provider) (citing *Stefanowich v. Colvin*, Civil Action No. 13-30020-KPN, 2014 WL 357293, at *2 (D. Mass. Jan. 30, 2014)).  The ALJ further observed that a GAF score of 50 was on the borderline between serious and moderate functional impairment,[8] and that, in any event, as a subjective snapshot at a single point in time, an isolated GAF score had limited value as evidence of a claimant's functional capacity (A.R. 26-27).  This determination was also well within his discretion.  *See, e.g., Lane v. Colvin*, No. C13-5658-MJP, 2014 WL 1912065, *9-10 (W.D. Wash. May 12, 2014) (affirming the Commissioner's decision; noting that the claimant had not shown that a GAF score of 50 "constituted significant probative evidence"); *see also Bourinot*, 95 F. Supp. 3d at 177-79 (noting that, although GAF scores may provide some evidence about a claimant's ability to function, the scores had "recently fallen into disfavor as an assessment tool").  There was no error in the ALJ's decision to accord little weight to this brief Psychiatric Disorder document (A.R. 586-87).

The ALJ also had before him a November 7, 2017, Mental Residual Functional Capacity assessment, completed by Dr. Steingiser, who opined that Plaintiff was markedly limited in her ability to maintain attention and concentration for extended periods, to complete a normal

---

[8] A GAF score of 50 to 41 is based on serious symptoms, such as suicidal ideation, severe obsessional rituals, or frequent shoplifting, or serious impairments in social, occupational, or school functioning, such as having no friends or being unable to keep a job.  *See* American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000) ("DSM-IV").  A GAF score of 60 to 51 is based on moderate symptoms, such as a flat affect and circumstantial speech, occasional panic attacks, or moderate difficulty in social, occupational, or school functioning, such as having few friends, or conflicts with peers or co-workers.  DSM-IV 34.

workday and workweek without interruptions from psychologically based symptoms; to work at a consistent pace without an unreasonable number of breaks; and to travel to unfamiliar places (A.R. 628-29).  In the narrative portion of the document, Dr. Steingiser stated that high levels of anxiety had a significant impact on Plaintiff's ability to function in the workplace because anxiety interfered with her ability to focus and concentrate, gave rise to memory problems, and interfered with her ability to get to work and to work a full day (A.R. 630).  The ALJ gave these opinions less weight than he gave to the opinions of the state agency psychological consultants, who found that Plaintiff was moderately limited in her ability to concentrate, persist, or maintain pace and to complete a normal workday and work week and would not be limited to any significant degree in her ability to get to work on time (A.R. 125, 129-30, 139, 143, 155, 160, 175).

Social Security Ruling 96-6, 1996 WL 374180, *2 (July 2, 1996) acknowledges the expertise of state agency psychological consultants and requires the adjudicator to consider their findings and explain the weight assigned to their opinions.  While these opinions can only be given weight "insofar as they are supported by evidence in the case record," "[i]n appropriate circumstances," such opinions "may be entitled to greater weight than the opinions of treating or examining sources."  *Id.* at *2-3.  The ALJ explained that the basis of his decision was that Dr. Steingiser's opinions did not match up with Plaintiff's ability to hold a part-time job or with the information in the longitudinal medical record, including that Plaintiff's mental health impairments improved with treatment.  He further observed that the opinion did not account for the role that stress caused by family circumstances, as opposed to a mental health impairment, had on Plaintiff's functional capacities during the relevant period (A.R. 27).

The ALJ supported his reservations about Dr. Steingiser's functional capacity assessment by reference to substantial record evidence, including many fairly benign mental status examinations including those recorded by a family nurse practitioner at Winchendon Health Center, that Plaintiff was able to work part-time and interviewed for jobs during the relevant period, and the evidence that Plaintiff's mental health impairments, including her anxiety, fluctuated in severity and improved with treatment. The "longitudinal medical record as a whole" (A.R. 27), among other things, reflected substantial gaps in mental health treatment between January to May 15, 2018, and May to October 2018, no hospitalizations or emergency room visits for any mental health impairment, and family circumstances, including an abusive marital relationship, as a substantial contributor to Plaintiff's anxiety and stress.

As Plaintiff points out, the record substantiates a longstanding history of anxiety and Plaintiff's reports of numerous panic attacks, at least one of which was observed by Dr. Steingiser, but "[i]t is the ALJ's prerogative to resolve conflicting evidence, and [this court] must affirm such a determination, even if the record 'arguably could justify a different conclusion, so long as it is supported by substantial evidence.'" *Vazquez-Rosario v. Barnhart*, 149 F. App'x. 8, 10 (1st Cir. 2005) (per curiam, unpublished) (quoting *Rodriguez Pagan v. Sec'y of Health & Human Servs.*, 819 F.2d 1, 3 (1st Cir. 1987) (per curiam)). In a case like this one, however, where Plaintiff's primary claim of disability was based on what she described as a longstanding anxiety disorder, and the longitudinal medical record did not show a significant increase in severity between August 2017, when Dr. Kellerman, the state agency consultant on reconsideration, completed her review, and the June 5, 2019 hearing decision date, the ALJ was entitled to accord significant weight to the opinions of the state agency consultants, and his decision as to the relative weight to assign to the opinion evidence was supported by substantial

evidence.  In turn, his reliance on the state agency consultants' opinions constituted substantial evidence in support of the RFC he crafted.

>      3.  The ALJ properly relied on Plaintiff's history of part-time work.

In support of the ALJ's finding that Plaintiff was not disabled, he placed significant weight on the evidence showing that she was able to work after the alleged disability onset date (A.R. 26, 27).  "[I]t is well within an administrative law judge's power to consider work that a claimant has done even if such work itself is not considered substantial gainful activity." *Akers v. Astrue*, Civil Action No. 08-30196-KPN, 2009 WL 2490112, at *5 (D. Mass. July 31, 2009) (citing 20 C.F.R. § 404.1571) ("The work, without regard to legality, that you have done during any period in which you believe you are disabled may show that you are able to work at the substantial gainful activity level. … Even if the work you have done was not substantial gainful activity, it may show that you are able to do more work than you actually did.  We will consider all of the medical and vocational evidence in your file to determine whether or not you have the ability to engage in substantial gainful activity.").

Plaintiff's complaint that the record does not support the ALJ's conclusion that Plaintiff had shown little difficulty attending work during periods of sobriety misreads the ALJ's decision and ignores the record evidence, which includes Plaintiff's hearing testimony, that supports his finding (A.R. 19; Dkt. No. 20-1 at 6-8).  The ALJ did not rely on earnings records from 2016. He relied on the earnings records from 2017 and 2018 that were summarized in his decision (A.R. 19).  The ALJ found that the records were evidence of Plaintiff being able to perform basic work activities and maintain a regular schedule although her work did not qualify as substantial gainful activity.  Plaintiff has not shown that these records were inaccurate in any way, nor has she shown that the ALJ erred in relying on these records as evidence bearing on Plaintiff's ability

to work notwithstanding her claims of disabling physical and mental impairments.  *See Akers*,
2009 WL 2490112, at *5.  The hearing decision did not reference earnings during the first and
second quarters of 2018, which corresponded to a time when Plaintiff reported to care providers
that she had been drinking heavily and, as a result, had been hospitalized several times for
serious illness (A.R. 646-47, 650, 674-75).  The ALJ's findings are consistent with and well-
supported by the record, and he properly relied on Plaintiff's work history after the alleged onset
of disability as evidence bearing on her ability to engage in substantial gainful activity in
positions available in the national economy.

       4.   The ALJ did not err at Step Five.

     After posing a first hypothetical question to the V.E. that incorporated the limitations and
restrictions for which the ALJ had found substantial support in the record (A.R. 102-03), he
asked the V.E. whether there would be jobs available for an individual who was consistently late
for work at least twice a week (second hypothetical); would consistently miss two to three days
of work a month (third hypothetical); or would be unable to engage consistently in sustained
activity for a full eight-hour workday (fourth hypothetical).  Predictably, the V.E. testified that
these limitations would eliminate all jobs (A.R. 104-05).  Plaintiff contends that the ALJ
committed prejudicial error by failing to explain why he did not adopt the V.E.'s testimony in
response to the second, third, or fourth of the hypothetical questions the ALJ posed to the V.E.
(Dkt. No. 20-1 at 15-16).

     The ALJ found that Plaintiff's residual functional capacity did not restrict her ability to
report to work regularly on a reasonably timely basis, and to sustain sufficient concentration,
persistence, and pace to work in a low stress setting (A.R. 22).  "Accordingly, the ALJ was
entitled to rely on the answer to the hypothetical that accorded with [Plaintiff's] residual

functional capacity as he found it to be." *Pinnick v. Colvin*, 132 F. Supp. 3d 180, 190 (D. Mass. 2015) (citing *Arocho v. Sec'y of Health & Human Servs.*, 670 F.2d 374, 375 (1st Cir. 1982); *Freitas v. Astrue*, Civil Action No. 10-10594-DJC, 2011 WL 2791039, at *10 (D. Mass. July 18, 2011)); *see also Mello v. Colvin*, Civil Action No. 13-10198-GAO, 2014 WL 1215055, at *6 (D. Mass. Mar. 25, 2014). There was no error.

> 5. Plaintiff is not entitled to judgment as a matter of law on the basis that she was approaching old age.

Finally, Plaintiff argues that this court should find her disabled as a matter of law as of September 5, 2020, when she turned 50 years old (Dkt. No. 20-1 at 3, 16). She offers no legal support for this request that the court order that the claim period remain open through her fiftieth birthday when, she asserts, she would automatically be deemed disabled pursuant to 20 C.F.R. § 404 Subpart P, App. 2, Medical Vocational Rules at 201.14. Plaintiff was born on September 25, 1970 (A.R. 252). The ALJ issued his decision on June 19, 2019. At all times relevant to the instant applications, SSA regulations classified Plaintiff as a younger individual, meaning someone between the ages of 18 through 49. *See* 20 C.F.R. Pt. 404, Subpt. P. App. 2, § 200.01(h)(1). While it is true that, with a restriction to sedentary work and no transferable skills, Plaintiff likely would be deemed disabled at age 50, *see id.* at § 200.01(g), this is not a borderline age case.

"A borderline age issue exists when (1) the claimant's age is within a few months of a higher age category, and (2) use of the higher age category would result in a finding of disability." *Szczesny v. Colvin*, Civil Action No. 13-12999-PBS, 2015 WL 13649813, at *6 (D. Mass. Feb. 11, 2015). "According to the Guidelines, a borderline age issue should be considered 'whenever the age category changes within a few months after the alleged onset date, the date last insured (or the prescribed period), or the date of the ALJ's decision.'" *Id.* (quoting

Application of the Medical Vocational Guidelines in Borderline Age Situations, Soc. Sec. Admin., Office of Hearings & Appeals, *Hearings, Appeals, & Litigation Law Manual* II-5-3-2). Here, Plaintiff did not turn 50, thereby "approaching advanced age" according to SSA regulations, until some fourteen months after the ALJ issued the hearing decision.  It is well-settled that, because age is determined at the time of the ALJ's decision, "a change in age does not constitute new evidence for purposes of the Appeals Council's review."  *Id.* at *7; *see also Veach v. Comm'r, Soc. Sec. Admin.*, Civil No. 1:13-CV-76-DBH, 2014 WL 35362, at *7 (D. Me. Jan. 6, 2014); *Justice v. Astrue*, 589 F. Supp. 2d 110, 111 (D. Mass. 2008); *Barrett v. Apfel*, 40 F. Supp. 2d 31, 38 (D. Mass. 1999).  Accordingly, Plaintiff's final contention fails as a matter of law.

V.    CONCLUSION

For the foregoing reasons, the Plaintiff Danielle J. Sargent's Motion for an Order Reversing the Decision of the Commissioner for Social Security (Dkt. No. 20) is DENIED, and the Defendant's Motion to Affirm the Commissioner's Decision (Dkt. No. 26) is GRANTED. The Clerk's Office is directed to change the identity of the defendant, to enter judgment according to the Memorandum and Order, and to close the case on the court's docket.

It is so ordered.

Dated: August 9, 2022                                    Katherine A. Robertson
                                                        KATHERINE A. ROBERTSON
                                                        U. S. MAGISTRATE JUDGE